UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 08-10112-RGS

UNITED STATES OF AMERICA

v.

ANGEL CAMACHO

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

April 16, 2009

STEARNS, D.J.

Based on the credible testimony, I make the following findings of fact.

1.  At 5:37 p.m., on January 11, 2008, New Bedford police received a series of 911 calls reporting a fight in progress at the intersection of Nye and Brook Streets in New Bedford's North End.  The Brook Street area is plagued by drug dealing, violent crime, and gang activity, much of it involving the Latin Kings, a violent Hispanic street gang with tentacles in many urban communities.  One of the 911 callers identified "most" of those taking part in the fight as Latin Kings.

2.  Sgt. Scott Carola, a fourteen-year police veteran and a member of the department's Gang Unit, was the first officer to arrive at Nye and Brook.  He observed twelve to fifteen persons, male and female, scattering in small groups from what appeared to have been a street brawl.  Among those retreating was a young man wearing a t-shirt despite the cold and wet weather.  His face was ruddy and bruised.  Sgt. Carola ordered the man and his female companions to stop, but only the women complied.  The man

continued to walk south on Brook Street.  Sgt. Carola then observed Pedro Cruz, who he knew to be a member of the Latin Kings, preparing to drive away in a Lexus.[1]  Sgt. Carola radioed in the license number of the Lexus and pulled the car over.  Sgt. Carola caught a glimpse of two Hispanic men who he did not recognize (one was defendant Angel Camacho) walking up Nye Street.

3.  Officers Adelino Sousa and David Conceicao, both nine-year police veterans and members of the Gang Unit, were on nearby patrol in a Crown Victoria, easily recognizable as a police vehicle.  They arrived at the intersection of Brook and Nye within a minute of Sgt. Carola.  Sousa observed several individuals in the dispersing crowd who he knew to be affiliated with the Latin Kings.  Seeing Sgt. Carola questioning Cruz, Sousa and Conceicao pulled their vehicle alongside.  Sgt. Carola directed the officers to intercept and question the two men he had observed earlier on Nye Street.  Conceicao saw the men, who were walking at a normal pace, turn the corner onto Bullard Street.

4.  Sousa and Conceicao followed.  As they entered Bullard Street, the only civilians they observed were Camacho and a companion, Louis Osario-Melendez.  They pulled ahead into the cut of a driveway, partially blocking the sidewalk.  Sousa stepped out of the Crown Victoria and approached Camacho.  Sousa was wearing a police jacket emblazoned "New Bedford Police Gang Unit" and bearing an image of a police badge. Conceicao, who was wearing an identical jacket, confronted Melendez and ordered him to place his hands on the hood of the cruiser.  Melendez complied.  Neither officer knew

---

[1] The Gang Unit had earlier been briefed on an intelligence report that the Latin Kings were importing gunmen from out-of-state to retaliate for the murder of a member of an allied New Bedford street gang.

Camacho or Melendez nor had reason to believe that they were members of the Latin Kings.

5. Sousa observed that Camacho's clothes were wet and that his breathing was labored. Sousa asked Camacho where he was coming from. Camacho replied "Nye Street." When asked if he had been involved in a fight, Camacho said "no," although he said that he had witnessed one. Camacho's speech was normal. He was wearing a hooded sweatshirt, which Sousa considered normal garb for the neighborhood. Camacho's hands were thrust in the front pockets of the sweatshirt. Sousa asked Camacho to remove his hands. Camacho complied in a deliberate and studied manner, keeping his hands clasped at the front of his waistband, as if to protect his midriff. The unusual positioning of Camacho's hands led Sousa to tap Camacho's waist with his open palm. He immediately felt the butt of a gun. Sousa yelled "gun." Camacho then shoved him. On hearing Sousa's shout, Conceicao drew his service revolver and trained it on Melendez. Sousa began fighting with Camacho. Conceicao intervened, hitting Camacho over the head with a flashlight, knocking him to the ground. Once Camacho was subdued, a .40 caliber Glock revolver with a live round in the chamber and eight rounds in the magazine was seized from beneath his belt.

## RULINGS OF LAW

1. Not every encounter between police and citizens rises to the level of a stop or seizure. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Whether a citizen's liberty has been

"restrained" by police for Fourth Amendment purposes depends on whether a reasonable person in similar circumstances would feel free to leave or to otherwise "disregard the police presence and go about his business." Michigan v. Chesternut, 486 U.S. 567, 576 (1988); United States v. Mendenhall, 446 U.S. 544, 554 (1980) (same). Cf. California v. Hodari D., 499 U.S. 621, 628 (1991) (the Terry-Mendenhall test "states a *necessary*, but not a *sufficient*, condition for seizure" – there must also be a physical restraint or a submission to an assertion of authority).

    2. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 143, 145-146 (1972). See also Terry, 392 U.S. at 24.

    3. "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-418 (1981). Conduct that might be perceived as innocent by a civilian onlooker may reasonably appear suspicious to an experienced police officer accustomed to the ferreting out of crime. United States v. Arvizu, 534 U.S. 266, 273 (2002).

    4. The stop and inquiry is not limited to ongoing or imminent crimes. Although a stop to investigate a completed felony may not involve the same exigencies as a stop

undertaken to prevent a crime in progress, the ability to briefly detain a person believed to have been involved in a crime in order to "ask questions, or check identification . . . promotes the strong government interest in solving crimes and bringing offenders to justice." United States v. Hensley, 469 U.S. 221, 229 (1985).

5.   A combination of suggestive circumstances, largely innocent in and of themselves, may constitute the "reasonable suspicion" necessary to justify a Terry stop. United States v. Sokolow, 490 U.S. 1, 9 (1989); Arvizu, 534 U.S. at 273-274. Factors that courts have considered in assessing the validity of a Terry stop include: (1) a report of a recent and serious crime, United States v. Raino, 980 F.2d 1148, 1150 (8th Cir. 1992); (2) furtive conduct suggesting consciousness of guilt, Illinois v. Wardlow, 528 U.S. 119, 124 (2000); (3) furtive gestures, Florida v. Rodriguez, 469 U.S. 1, 6 (1984); (4) nervous apprehension at the approach of police, United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); (5) suspicious presence in a "high crime" area, United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996); (6) proximity to the scene of a reported crime, United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983); (7) an officer's experience and specialized knowledge, Arvizu, 534 U.S. at 276; (8) an officer's knowledge of a suspect's reputation, United States v. Kimball, 25 F.3d 1, 7 (1st Cir. 1994); (9) information from a reliable informant, Adams, 407 U.S. at 146-147; (10) resemblance to a witness's or victim's description, United States v. Martin, 28 F.3d 742, 744-745 (8th Cir. 1994); and (11) evasive answers to police questions. Devenpeck v. Alford, 543 U.S. 146, 155-156 (2004).

6.   Police "do not violate the Fourth Amendment by merely approaching an

individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion). See United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997) ("got a minute?"); United States v. Adegbite, 846 F.2d 834, 838 (2d Cir. 1988) (plainclothes agents waved down defendants' truck to ask if they would answer questions); State v. Gerrish, 815 P.2d 1244, 1248 (Or. 1991) (officer flagged down motorists who might have witnessed a crime). Cf. United States v. Garcia, 866 F.2d 147, 151 (6th Cir. 1989) ("[T]he one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place which the defendant had not planned to go"); Sokolow, 490 U.S. at 7 (defendant was forced back onto the sidewalk).

7.  If there is a reasonable basis for believing that a suspect poses a danger to police or to others, he may be "frisked" (patted down) for possible weapons. The frisk may extend beneath a person's outerwear if the officer feels a suspicious object that could be a weapon. See Terry, 392 U.S. at 22-25.

8.  "While the justification for an officer's proximity to a suspect frequently is a Terry stop, a patdown also may be permissible in other situations where the officer necessarily comes into contact with a person he considers dangerous. . . . [If] the officer's proximity to the defendant was justified . . . we ask only whether the patdown was supported by a reasonable belief that the defendant was armed and dangerous even though . . . the officer may not have had sufficient information to justify an investigative stop under Terry v. Ohio."

Commonwealth v. Fraser, 410 Mass. 541, 544-545 n.4 (1991) (officer investigating a report of a man with a gun patted down a defendant who refused to remove his hands from his pockets).

9.  Courts are divided over the issue of whether an officer who initiates a consensual field interrogation or encounter without grounds for a Terry stop may frisk the person on suspicion that he is armed.[2]  Justice Harlan in his concurring opinion in Terry, 392 U.S. at 32, thought not – a view endorsed by Professor LaFave and many, but certainly not all, state and federal courts.[3]  See Wayne R. LaFave, 4 Search and Seizure § 9.6(a), at 616-618 & n.12 (4th ed. 2004) (noting the split in authority).  Compare United States v. Burton, 228 F.3d 524, 528-529 (4th Cir. 2000) (consensual encounter escalated into an improper frisk) and Graham v. State, 807 A.2d 75, 96-98 (Md. Ct. Spec. App. 2002) (rejecting the proposition that an officer has the right to pat down a suspect upon the

---

[2] The Supreme Court appeared poised to answer the question definitively in Arizona v. Johnson, 129 S. Ct. 781 (2009), but instead decided the case on a narrower ground.

[3] Justice Harlan's full thought on the issue was as follows.

> [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop.  Any person, including a policeman, is at liberty to avoid a person he considers dangerous.  If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence.  That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection.  I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forceable stop to investigate a suspected crime.

Terry, 392 U.S. at 32-33.

initiation of a suspicionless "field interview") with Fraser, 410 Mass. at 545-546 (danger to the officer may arise in any context) and United States v. Davis, 202 F.3d 1060, 1063 (8th Cir. 2000) ("The danger to officer safety that justifies a protective search may arise after a consensual encounter or investigative stop has commenced.") and United States v. Flippin, 924 F.2d 163, 166 (9th Cir. 1991) (same, consensual entry).  The essential premise of Professor Lafave (and Justice Harlan) is that an officer who initiates a consensual encounter lacks a legitimate basis for being in the near proximity of the person whom he approaches.  "[I]n such a case the officer may protect himself by not engaging in the confrontation."  LaFave, supra, § 9.6(a), at 617-618.[4]

### ULTIMATE RULINGS OF FACT AND LAW

1. Camacho and Osario-Melendez were detained for Fourth Amendment purposes when Officer Conceicao ordered Osario-Melendez to place his hands on the hood of the officers' car while Officer Sousa began questioning Camacho.  Although the order was not issued to Camacho personally, he was a few feet away standing face-to-face with Sousa, who was asking questions that were accusatory in tone and content.  No reasonable person in Camacho's situation would have believed that ignoring the officers' presence and going about his business was a realistic option.

2. The stop of Camacho and Osario-Melendez cannot be justified under the

---

[4]In the 2008 supplement to his treatise, Professor LaFave appears to back away to some extent from Justice Harlan's view, noting a "limited exception" to a non-Terry field interrogation.  "If the officer has commenced a nonseizure confrontation without a preexisting reasonable suspicion supporting a frisk, but such suspicion suddenly appears (most likely because of the suspect's conduct), then the officer is entitled to frisk for his own protection."  LaFave, supra § 9.6, at 105 (2008 Supp.).

principles of Terry. The most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings.[5]  See Wardlow, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). The reported crime, at most a misdemeanor assault and battery or disturbance of the peace, was not terribly serious, nor had Camacho or Osario-Melendez been identified by bystanders as having been participants in the brawl. Neither man was known to the officers nor (as the government candidly conceded at the suppression hearing) was there any reason to believe that either man was affiliated with the Latin Kings. The men were walking normally on a residential sidewalk and displayed no apprehension or nervousness when the officers approached. Camacho's answers to Sousa's questions about where he and Osario-Melendez were coming from and whether they had taken part in the fight were direct and non-evasive.

  3. On the other hand, Camacho's unusual positioning of his hands in front of his waist in an apparent attempt to shield his groin area could have reasonably been interpreted by an officer with Sousa's experience as a defensive posture foreshadowing an armed attack.

  4. Sousa's physical touching of Camacho's waist, although momentary and

---

[5] In assessing the validity of a Terry stop, a court will look to the totality of the facts within the collective knowledge of all the officers involved. Hensley, 469 U.S. at 232; United States v. Cook, 277 F.3d 82, 86-87 (1st Cir. 2002). Sgt. Carola's observations of Camacho and Osario-Melendez walking normally from the scene of the fight, however, add nothing to the calculus of suspicion.

minimally intrusive, involved a "laying on of hands" that met the legal definition of a "frisk." Cf. Hodari D., 499 U.S. at 628.

5. Despite the absence of reasonable suspicion for a Terry stop, the court is of the view that a police officer is justified in undertaking a protective frisk whenever events arise that give the officer a reasonable basis for believing that the person with whom he is in contact poses an imminent danger to the officer's safety or that of other officers. This is true whether or not the encounter preceding the frisk satisfies the legal requisites of a Terry stop.

6. Whether evidence (here, the gun found on Camacho) that comes to light during the course of a lawful frisk following an unlawful seizure should be suppressed is a different matter.[6] While ordinarily one would think that the case for suppression in such a circumstance is strong (if not necessarily compelling), here I conclude that suppression of the gun is neither called for nor appropriate. I do so for the following reason. The gun was seized only *after* Camacho shoved Sousa and only *after* the officers succeeded in wrestling Camacho to the ground and placing him under arrest. The acts of shoving

---

[6]The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect on future unlawful police conduct, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 348 (1974). "The exclusionary rule [operates] . . . to safeguard against future violations of Fourth Amendment rights through its deterrent effect. . . . Where 'the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.'" Arizona v. Evans, 514 U.S. 1, 10-11 (1995) (quoting United States v. Janis, 428 U.S. 433, 454 (1976). "Suppression of evidence . . . has always been our last resort, not our first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). The suggestion that officers who confront danger after initiating consensual encounters should be discouraged from conducting defensive frisks in the interest of deterring future illegalities seems unreal and dangerous.

Officer Sousa and resisting arrest were intervening crimes giving the officers independent grounds to arrest Camacho.[7]  See United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1983) (en banc) (resistance to an even unlawful arrest provides sufficient and independent grounds for a second arrest for a new and distinct crime).  See also United States v. Sprinkle, 106 F.3d 613, 619-620 (4th Cir. 1997) (same); United States v. Dawdy, 46 F.3d 1427, 1431 (8th Cir. 1995) (same); United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (same). The seizure of the gun from Camacho's person was therefore justified under the search incident to arrest exception to the Fourth Amendment. United States v. Robinson, 414 U.S. 218, 236 (1973).

### ORDER

For the foregoing reasons, the motion to suppress is DENIED.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[7] See Mass. Gen. Laws, ch. 265, § 13D; Mass. Gen. Laws, ch. 268, § 32B.